and others. Arguments not to exceed 15 minutes per side. Mr. Akeel for the appellant. Good morning. Good morning. Good morning, your honors. My name is Adam Akeel. I rise on behalf of appellant Terry Reedy, P number 81328. It is an honor to be here today. Two issues before this court. First, whether when viewing the evidence in light most favorable to appellant, plaintiff, at the summary judgment stage, is plaintiff able to show that defendant's legitimate business justifications were pretextual? And second, whether when viewing the light most favorable to plaintiff, whether plaintiff will be able, can demonstrate a causal connection between the protected activity of seeking workers' compensation and the adverse employment action that happened to him. Your honors, there has been a lot of testimony in this case. A brief timeline of what exactly occurred will be helpful. On January 27, 2015, it was a Tuesday, Mr. Reedy is a truck driver. He makes four stops, starting at 2 a.m. to 2 p.m., and his last stop is in Indiana before returning to his home in Michigan. At his last stop in Indiana while undoing a trailer, he slipped, fell on ice, hurt his back. He went in and hit the terminal manager. The terminal manager told him to report it to his direct supervisor. He informed his direct supervisor, and his direct supervisor told him that he needed to submit to a random drug test, to which he passed. Later that evening, he was told that they would not be giving him workers' compensation. Fast forward two days later, Mr. Reedy was on the road at around 5 a.m. Just a series of unfortunate events. He was caught in a horrible blizzard. His semi-truck did a 360 on the freeway. He informed dispatch that he felt unsafe. He could cause harm to himself and others. Dispatch informed him to find a safe spot to park his truck and go home. He called a friend. His friend came, picked him up, took him home. Mr. Reedy's wife, the previous month, had left him at Christmas with five young kids. So Mr. Reedy would have to get babysitters for his kids, and because the storm was that bad that night, or that morning, school was canceled, and so the babysitter was there watching. Did the employer know all this to start with? Did the employer know that his wife left him and he had all his children at home, or did that come later? That came later. The decision-maker found out later. His direct supervisor knew about this before. Now, if they didn't know that, could they have gone ahead and fired him because they thought he should have gotten back in that truck and driven through the snow? They could have done that, could they not? Absolutely. Because it was an at-will position. But the question is whether the fact that he was a single parent was a motivating reason, whether it was a factor that played in the decision-making of Mr. Lister, which was the safety director who ended up terminating my client. What was the issue that the district court thought this case was settled, and was it settled? If it was settled, why do we even have it here? The Bullard-Pilwaukee Act claim was settled. What is that? My client requested his employee file from his employer. His employer said that's private information. So under the Bullard-Pilwaukee Act, you can bring suit for denying an employee their employment application. The other two claims were under the Workers' Compensation Act because he reported a claim on Tuesday. He was terminated on Sunday. Besides temporal proximity, what evidence is there that the firing was in response to the Workers' Compensation claim? Your Honor, I believe the totality of circumstances in this case demonstrates that Mr. Reedy had become an inconvenience on Saturday, the night before he was terminated. Mr. Lister, his boss, on lower court docket number 13-5, page 419, he testified that the night before he, or two nights before, the Saturday, So after Mr. Reedy went home and was stuck with his kids on Thursday, that same Thursday, Mr. Lister called Mr. Reedy and said, First question, are you a single parent? I'm sorry. I'm bouncing off. You are, a little bit. So let's just focus on this thing. I got a little nervous when your first answer was totality of circumstances. Then I want to hear what the circumstances are, and we didn't go there. So back to the question is, temporal proximity would seem to help you on the firing in retaliation or in response to the filing of a workers' compensation claim. But that by itself usually doesn't do the trick. So what's the evidence as to that claim of the fact that that's why the firing occurred? Well, Your Honor, first of all, the night before, two nights before it happened, Mr. Lister claims, or Mr. Lister testified that Mr. Arce had just told him that Mr. Reedy had been terminated. The next day he got a call from another. So that's knowledge of the claim. Knowledge of the claim. That's always going to be true. The next day, Mr. Reedy got a call from another truck driver saying, hey, Mr. Lister just put you on medical leave. And then the following day he fired him. Okay. All right. So I think I've got that claim. So now on the spousal one, what do we do with the fact that this is a Michigan law case, right? This is not the federal statute, and it refers to marital status. I mean, so that's, I'm quoting it. And, you know, relationships and marriages are, it's a big spectrum. But one thing that's not a spectrum is whether you're married or not, and they were still married. Right, Your Honor. But marital status is, it's the statute, civil rights statutes are designed to prevent the legislative intent behind it. It's designed to prevent an employer from taking into consideration certain protected characteristics when deciding whether to take an adverse employment action. I don't think a protected characteristic is which of the two married people is taking care of the children if they're married. I mean, you have lots of family situations where there's a lot of people doing different things. Well, one of the stereotypes of being a single parent is having to tend to your children's needs. But this exact scenario could happen with a married couple living together and both working, all right? If they're both working and the spouse is a resident in a hospital, she's not going to be able to look after the kids. Everything about the case is identical. You have the exact same problem. So I don't, I'm struggling with why this case even fits the statute when it says marital, that's the words, marital status. Your Honor, I believe there's a few cases that are persuasive on this point. First case is a Supreme Court case, Mount Clemens v. Ford Motor Company. This is a Michigan Supreme Court case. Michigan Supreme Court. And I quote MCL 37.2202, this case, forbids an employer from using a classification protected by the CRA. Okay? And then Miller, the next case is Miller v. C.A. Muir Court. Wait, wait, okay. So the first case, the one you just told me about, prohibits use of a classification. Right. But they were married. Right. Yeah, so the next case that I... It wasn't discrimination because they were married. It's your view that it was discrimination because they weren't married. Because he was a single parent. That wasn't true then. It's not true now. He was separated from his wife at the time. Which is, defendant's argument is that because Mr. Reedy was not legally separated or legally divorced, he can still be discriminated against because he was single. It's only once he became legally separated or legally divorced that this statute would protect him from that same exact type of discrimination. The district court found in our favor on this issue, and the reason for that was because they found the case in Miller v. C.A. Muir Court, Michigan Supreme Court case. Their analysis of this was very persuasive. And I quote, The legislator did not define the term marital status in the Civil Rights Act. It has been said that the term means whether one is married or not, or the social condition enjoyed by an individual by reasons of his or her having participated or failed to participate in a marriage. The usual answer to a query about one's marital status is married, single, divorced, widowed, or separated. Mr. Reedy was undeniably separated during this time. The next case... I'm sorry, just which case was that one you're reading from? That was Miller v. C.A. Muir Court. And that's which court in Michigan? Michigan Supreme Court, 362 NW2D 650. Was that a case about someone who was separated? That was a case about two individuals who were married in the workplace, and the employer prohibited or forbade against that. So they brought a claim under marital status, and the court found that anti-nepotism actions is not protected under this statute. However, they did make a pretty persuasive argument for our case. The next argument that we believe is wrong. Are you proceeding under direct evidence or circumstantial evidence? Does McDonnell, Douglas kick in here? I believe there's both. We have direct evidence of Mr. Lizard saying, had I known you'd been single, you would have not had been hired. Was he the hiring authority? He was the one with the final sign-off and final say on who gets hired. He's also the one who called and fired him. He said he wouldn't have hired him, but he didn't say he would have fired him. But that's direct evidence, or is that circumstantial evidence? Your Honor, I see my time has left. May I briefly? You can answer that question, sure. I believe it's direct evidence that the decision-maker had animus in his mind at the time of making his decision. Your opponent says you don't have a comparator to show somebody else who wasn't in that situation, and you haven't answered that in your brief, have you? No, Your Honor. You don't think that applies? No, Your Honor. So let's just think of it as an indirect evidence case because you're also arguing in the alternative. Then we get to this debate about whether there's a non-protextual reason. So the company's perspective is put to the side what happened on the morning of, I guess it's the 29th. So 6 a.m., he says, you know, I had to leave. 10 a.m., he's told people are back on the roads to go get the truck. He doesn't. He says, I can't get something for my kids. I guess what I'm hearing them saying, and tell me where I'm wrong, is the truck is still left. Well, someone comes and gets the truck to its place. You still have company property left there until February 2nd. And from their perspective, that was abandonment. That's just refusing to do your job. And I'm sure you agree, if that's true, that would be a non-protextual legitimate reason for firing. So why is it protextual in your view? I believe this is a question that should have been left to the jury. I believe that this comes down to credibility determinations and weighing the evidence. And at the summary judgment stage, I don't believe the judge should have dismissed the action because he believed that defendant could have actually done it for a legitimate reason. Well, don't you need more than that? What you believe? I mean, what's the evidence that? Shifting justifications. Just constant shifting justifications. If you look to the facts in our brief and also the record site, our response to defendant's motion for summary judgment, we lay out all of the shifting justifications. But what's your client's defense? I mean, January 29th to February 2nd? I mean, that's a long time to leave company property. He was off. He works from Monday to Thursday? Yes. And he got a call on Friday saying, did you make arrangements to get your truck? The blizzard was still going on. There was a hundred car pileup on the road. Yes, you could drive with a car during the blizzard, but not with a semi truck. He couldn't get anybody to watch his kids still, so he wasn't able to go return and get his truck. Or was his justification, hey, I don't work some of those days, so you can't hold me responsible? No. No, it was my current circumstances are not allowing me. I cannot go get the truck unless you let me take my kids with me. His employer said no and hung up. He was unable to do it. The route wasn't even going on Friday, Saturday, and Sunday due to weather. I don't know what days of the week are January 29th, so it's not very helpful to me. You're telling me from January 29th to February 2nd, no one was doing this, even though someone obviously delivered the truck during that time. So someone did deliver the truck to the client. The trailer. All right. So is that the theory, though? Is your theory no? You could not go out in a snowstorm, and the snowstorm went from January 29th to February 2nd? Our theory is that he was— Or is the theory that you couldn't get a babysitter during that time? That he was obligated to stay home with his kids, and that was an inconvenience to his employer, and that motivated their decision to just get rid of him. But why can't an employer say you can't leave company property abandoned for four days, five days? He was told to leave it there, right? He was told by dispatch to leave it there. Okay. And then when did this mic come to get it? What's that about? I believe Sunday he got a call by mic saying you're on medical leave, I'm coming to get your truck. And this was the day after the decision maker in this case found out, allegedly, that our client also had a worker's compensation claim. So now there's two inconveniences in the employer's mind. And we believe there's sufficient evidence for this to go to a jury to be able to make them make a credibility determination to see whether all the shifting justifications— And when was he supposed to go back to work on his regular schedule? Monday. Monday when? 2 a.m. And when was he told not to go back to work? I don't know the exact hour, Your Honor. I just want to make sure I'm getting—is your point that from his perspective, a jury could find that he was never told to get the truck? Once he got a friend, Mike, to get the delivery done, it didn't matter that the truck was there until February 2nd. In his mind, the company didn't need him or didn't want him to go get the truck between January 29th and February 2nd. Is that your theory? The theory is also that— Just yes or no as to that, and then you can add another one. Can you state it again? I'm just trying to figure out—you referred to their shifting justifications. I'm trying to figure out what your theory of pretext is. What I thought I heard you saying in response to Judge White is he wasn't told to get the truck and remove it from this lot before February 2nd. He was told. He was told on Friday, but he was unable to because— So the real theory is from January 29th to February 2nd, it's not snow, it's not what you were told, it's couldn't get a babysitter during that time. That's the key point. He was obligated to stay with his children at least for a couple days. Whether that was a legitimate reason for terminating him or not, it may be. It is. If the employer actually used solely that justification, that would make sense. But if the employer also considered how big of an inconvenience he has been for his workers' compensation claim and or for being a single parent after he told him, you would have never been hired had I known this, then that is discrimination in violation of both statutes. Right. So you're conceding that he had an obligation to get the truck when he was not— I think you just said that would be an okay explanation by itself if there weren't the evidence of workers' comp and there weren't the evidence about we wouldn't have hired you if we'd known you were a single parent. Yes, Your Honor. Any reason at all in an at-will employment would be okay. But if one reason is a protected status or a protected activity, then it is illegal. It just needs to be a reason in the employer's mind or the decision-maker's mind when terminating the employee's position. We believe that there's sufficient evidence for this to go forward to a jury. It's very—I'll have to think about it. It's funny to me to have the employee admit that—we'll say there's three potential explanations for a firing. It's just a funny setting for me to think of a world in which the employee acknowledges that one of the three are legit. But could be. Well, no, are nondiscriminatory. That's the point.  But then to say, but I want to go to a jury because I think what I can get the jury to see is that that's not what they really thought. And also, Your Honor, that that wasn't the initial reason that was given. The initial reason was that the employee abandoned the truck. Cindy Chandler also said he voluntarily quit. He abandoned his truck. It was self-termination because he did not notify dispatch. This was their initial justification. It wasn't until we started poking holes and we found that the employee handbook says one is only considered to have abandoned his truck when he does not notify dispatch. Our client's testimony was he notified dispatch. His supervisor said, yes, he did notify dispatch. It then changed to, by the end, that he refused to pick it up. I think we have it. You'll get your full rebuttal. So we'll get from the other side and we'll give you all of your rebuttal. Thank you, Your Honor. May it please the court. My name is Denise Greathouse. I'm with Michael Best and Friedrich. I'm speaking on behalf of the appellee, Rich Transport. We're here today on two counts that was dismissed. It was a partial summary judgment that was granted by the district court on two relevant points, Your Honors. The first one was the Michigan Elias Larson Civil Rights Act claim that was count one of Mr. Reedy's complaint. The second count, the third count, Your Honor, that was granted by the district court was Michigan's Workers' Disability Compensation Act claim. We're asking today that the court affirm that decision. I will first begin by discussing Mr. Reedy's argument regarding the Michigan's Elliot Larson Civil Rights Act. He's claiming marital status discrimination. First, we will argue, although the district court did not agree, that Mr. Reedy was not in a protected class. He claims marital status is single parent, but for over 20 years, he was married. He says that there's some Michigan cases that suggest that if you're separated and the employer knows that, that that counts. There's not one Michigan case that suggests that. One case that he, sorry, opposing counsel mentioned was a Miller case. And what they were referring to in the Miller case, when they said marital status, if you're married or not, the focus had been if you are married or if you are not married. What was not addressed was if you're single, I mean separated, legally separated. If you're divorced, if you're widowed, those had not been addressed in the application. So that's why they went further to say separated. But it was not saying separated, not legally separated. It was no discussion saying that just separation without it being legally separated counted for. Can I ask you a question? You've used the phrase legally separated twice, and I'm a little embarrassed. I don't know enough about this yet. I guess I'm happy I don't know enough about this yet. But is the one spouse is really angry and they walk out and they say, I'm out of here. Is there something that makes that, quote, separation legal? Like do you file papers and say we're legally separated on our way to divorce? Yes, Your Honor. That's what happens? Yes, Your Honor, because, you know, in marriages, people walk out all the time, right? Right. You can go on a weekend with your friends and say, I think I'm coming back, but I'm not sure. It depends on how I feel at the end of the weekend. And actually that happened in Mr. Reedy's case because they were only separated for months. So were they, quote, legally separated? They were not, quote, legally separated. Actually, to be, quote, legally separated, you go to the courthouse, you file separation documents, and what it does is it allows a marriage or the two individuals to decide if they want to go further and actually get the divorce. Legal separation does not get involved where you have a situation where with divorces, depending on the state, you have to start dividing things. With legal separation, you don't have to go through those things. So you're agreeing with the court that right now we're legally separated, but we're not ready for a divorce. Well, does it apply for just because a person has children? Does this Elliot Larson apply if they discriminate against the driver because he's got some children at home? Period. I mean, he's legally married, but suppose he's a single person with some adopted children. The marital status under Elliot Larson's Civil Rights Act, the marital status claim is regarding the marriage itself. There's no protection regarding if you're a parent or not. Married people have kids, and it could be a wife or a husband who has most of the responsibility and could have been stuck in the same situation as Mr. Reedy, who was separated, not legally, was separated at the time. So in answering your question, Judge, Your Honor, no, it does not protect someone just because they have kids because that could be a married person or a single person, a divorced person as well. Is there any case in support of your position, or are you just going by the language of the Act? Your Honor, there are actually no cases that have perceived marital status. We were not able to find one case regarding perceived marital status. What we were able to find, there are cases regarding marital status discrimination. And what you would notice, there's a trend with this marital status discrimination. One, they would say that marital status discrimination is defined, is not defined in the statute, but it is defined to mean, based on the courts and what legislation intent was, is to go after the actual if you're married or not situation, not the conduct of the person. How they discuss this is in three different cases. In one case, there was a situation, and this is Venstra-Washtenaw, excuse me for mispronouncing these, Country Club, 645 Northwest 2D 643. This is the Michigan Supreme Court, 2002. In that particular case, it was an individual. He actually was separated, not legally separated yet. He was going for a divorce. He was working in the Country Club with his wife. He was having an affair, or he had a mistress. Country Club members didn't like it. They did a survey. A number of Country Club members said, you know what, the fact that he is getting a divorce but not divorced yet and is living with someone, we don't like it. Employer terminated him. The court said in that particular case, look, for marital status, we don't address conduct. We address your status. You have not pointed at anything that stated that based on your status as married, not married, or divorced, is the reason for this claim. I would say the same thing in this particular case. There has not been one argument yet that says that Rich Transport had any type of adverse action against Mr. Reedy due to him being, he was married, I can't even say single. Yes, so one background principle that I guess could inform this is I know of one area where perception of status is covered. So that's in the disability discrimination arena. So the federal laws are explicit about it. But are there other areas? Because, I mean, what I could see saying from his perspective is, well, there are other areas of civil rights discrimination where the perception is enough. And I know that's, I would consider that a background principle with disability discrimination. Does that apply in other areas? I have not seen it apply in any other cases in any other areas, Your Honor. And even in that particular case with ADA, they spell it out, allowing the perception as well, is perceived as disability. And in those cases, Your Honor, too, I want to note there's Oliver Arce. That's the dispatcher. This is who Mr. Reedy sees as his supervisor. This is the person he speaks with four to five times a day. Yes, there is a night dispatcher, but those are random. He has one person that he considers his supervisor based on his testimony. Mr. Sam Lister, who allegedly made the comment, and I have to think most favorable, just like the court has to feel most favorable to Mr. Reedy. Mr. Reedy would say Mr. Lister has no control. He doesn't have the power to hire. He doesn't have the power to fire. He's only had one contact prior to this alleged call with Mr. Lister, and that's because Mr. Lister is a safety person. And as a safety person, Mr. Reedy received a speeding ticket, so that was the only contact he had. Is that the same person who said that if I had known you were married and had children or something to that effect, I never would have hired you? Yes, the alleged comment would have said that it came from Mr. Lister. But you're saying he doesn't have any authority over hiring or firing. That's correct. We have to look at Mr. Reedy's testimony, and based on Mr. Reedy's testimony, he said no. He has no authority to hire or fire. Who told him he was fired? Actually, no one communicated. In reality, no one communicated that to them. We have over 300 employees, drivers. They turn around very quickly for various different reasons. When they stop coming to work, it's considered terminated. We don't give you another route. That's how it's communicated. You don't get another route. So there are no letters sent out, unfortunately. Did he call saying, when's my next route? It's my understanding that on Tuesday, which would have been February 3rd, he called regarding his status at Rich Transport. And they said you abandoned the job? Is that what they said? They said that you don't have a route. It's our understanding you're no longer here. He was speaking to a random dispatcher. Well, let's go back to that. Yes. Your position is that the first time he called after this disagreement about whether he could bring his kids or had to go, whatever, was February 3rd on Tuesday? No, there were different calls in between there. But regarding his actual employment, Your Honor, that would have been that Tuesday. So there are calls being made from actually Rich Transport to Mr. Reedy. So there's communication there trying to get him to his truck and trying to pick up that truck. But that had nothing to do with the termination. When I brought up that date, it was regarding Mr. Reedy inquiring regarding the status of his employment at Rich Transport. Okay. How would he have, let's say, do I understand correctly he's supposed to start Monday at 2 a.m., or is it Tuesday at 2 a.m.? He would start Monday at 2 a.m. Okay. So when would he call in for that assignment? He already has his truck. He has a normal routine. He doesn't change his routine. Only thing he does is keep his dispatcher aware of where he is. And that's why Mr. Arcey Why didn't he show up on Monday at 2 a.m.? I have no clue, and that was our problem. No clue. I have no clue. Besides, he was terminated. He felt he was terminated. He had abandoned his truck. He knew that Mr. Arcey had told him to get back in that truck. He knew that we had picked up that truck as well on Monday because he did not grab his truck. So he has no trailer. Okay. I'm confused. I thought somebody did Mike pick up the truck or the trailer? Mike picked up the actual truck. The truck. So the trailer was still sitting there. No. So the truck and trailer. Sorry, I should have rephrased. So just to step you through, on January 29th when he called about the snowstorm and he couldn't drive, night dispatch, he claims he called. January 29th was which day? Thursday? Thursday, yes. So when he called saying that he couldn't drive, and this is at 6, I'm sorry, in the morning. He pulls over and places that at a truck stop, and then he goes home. Okay. Is that before or after midnight? 6 a.m. 6 a.m. 6 a.m., okay. I'm sorry. I'm sorry. So at 6 a.m. the call is made to night dispatch. His actual supervisor that he's used to is not in yet. Comes in at 9, Mr. Arce, Oliver Arce. Mr. Arce comes in. There's no movement of the truck. They're getting calls from customer service that it hasn't been dropped off. They haven't received deliveries. Mr. Arce contacts Mr. Reedy to say, where are your whereabouts? Where are you? He said, I dropped the truck off at the truck stop. He said, the roads are clear. We need you back in that truck. He said, I'll call you back. He needed a baby because he sent his babysitter home. He called him back. He called Mr. Arce back. He said, I can't get a babysitter. I can't get back to the truck. What time was this? What day was this? This is still January 29th, Your Honor. And this is? Thursday. Thursday. We wouldn't know exact time, but Mr. Reedy is saying it's around 10 a.m. So I'm just sticking with Mr. Arce did not have any testimony regarding time frame. So at 10 a.m., Mr. Arce is, again, telling Mr. Reedy he needs to get in that truck. And this is, or he would still be on duty then? Yes, because he's not off duty until 2 p.m. So Mr. Arce is trying to get Mr. Reedy in the car. It's also noted by Mr. Arce in his testimony that while he feels roads are clear enough to drive, because he has another driver that's doing a similar route, not the same route, but a similar route in Michigan, and they're not having any problems. So he's asking Mr. Reedy to get back in the truck. Mr. Reedy still refuses to get back in the truck. Mr. Arce is now frustrated. Now he has to find someone to actually deliver what Mr. Reedy has in the trailer to the next customer. He still needs to drop that load. So arrangements are made for a driver to actually go to the truck and get the trailer that has material in it, for lack of a better word, so it can be delivered. Mr. Reedy agrees to do that. That's on Friday? This is still Thursday. Okay. Still Thursday. Yes, it was a long day. I'm sorry, Your Honor. He asks a friend to drive him to the truck. He then unhatches the trailer. So he brings his kids with him, right? He brings his kids with him, yeah. Unhatches the trailer, allows the driver, and we're not sure the name of that driver, just in case that's a question. I'm not sure. And the driver takes the load and continues Mr. Reedy's route for that day. He also leaves an empty trailer for Mr. Reedy because Mr. Reedy is supposed to start back up and pick up his truck and continue on when he feels that it's clear. Mr. Reedy never does that. Mr. Reedy never picks up his truck. That day passes. Two PIM passes. We don't know. But wait, why is he supposed to – if that load is already taken, why is he supposed to pick that up on Friday if that's not his work day? Because Mr. Arce told him to, based on testimony. Based on Mr. Arce's testimony, he's telling Mr. Reedy he needs to pick up the truck. And Mr. Reedy will also say that he works – I'm sorry, Your Honor. Go ahead. That Mr. Reedy's testimony will also say that he works on Fridays sometimes, too. This Monday through Thursday is not just a set schedule. Sometimes he works on Friday. His testimony is not so strong saying, I did not work that Friday. I'm sorry. What's the record say about where a truck can be – where the trailer can be left? So Mr. Arce would say – It's an empty trailer, so it doesn't have client goods, but I assume the trailer is the company property? It's the company property. And, Your Honor, we've had this problem before. Mr. Arce's testimony would discuss this as well. And I think the HR person, which is Charlotte Jones, may speak of this as well, and that there is a concern that if you leave a truck at a truck stop for too long, they would tow it, and then we have more expense trying to get the truck. And that was a concern Mr. Arce had. It's not a vandalism theft problem. It's a ticket problem or a tow problem. Correct. A tow problem. Tow problem. Because it's not the property of the company. What reason did your client give for firing him? Abandoning the truck and not picking it up. And I know there has been testimony, if I can just go just a bit further on that, there's been testimony saying that there's been different reasons for it. One was spoken of, Cindy Chandler, which is actually the terminal manager in Indiana, has no authority over Mr. Reedy, is not in the corporate office at all. And what she's saying is something she heard. It was based on hearsay that it was abandoning the truck, that he didn't report to dispatcher. So there's never been a change. Is there a definition of abandoning the truck? Yes, Your Honor. In the policy, there's a definition that if you leave the truck or you don't report to the truck, that's considered abandoning your job. Okay, but he did. According to him, the dispatcher told him to park it at the truck stop and have someone pick him up. Yes, that's the night dispatcher. But his supervisor, his direct supervisor that he deals with every day, five times a day, he received assignments for, told him to go to that truck, and he didn't. He didn't pick it up on January 29th. He didn't pick it up on January 30th. He didn't pick it up on January 31st. On February 1st, he still didn't pick it up. When was he fired? That would have been February 2nd, Your Honor. And what day of the week was February 2nd? Tuesday. Tuesday. I think I did that right. Tuesday, Your Honor. Maybe Monday? That might be a good one. I had a cheat sheet on that. I think Monday might be the second. It is the second. It is. Monday is the second. I think you were saying earlier Tuesday because February 3rd is when. He called. Right. Yes, Your Honor. Right. Yeah. So that was the first communication that he wasn't getting new routes. That's correct. Right. And what about these comments about, you know, when he says, I have my kids, I can't do anything, and then someone says, and then the comment, well, if you were a single parent, you know, we never would have hired you if we'd known that. So those are two different conversations. Of course, we would deny that that comment was made. But the comments regarding Mr. Reedy discussing his kids, that's with Mr. Arce. His dispatcher, who he would say never had made any comments regarding him being a single parent or had any problems with him being a single parent. Mr. Arce will also talk about we have single parents. The comment you're referring to, Your Honor, is one that's coming from supposedly Mr. Lister, the safety guy. And in that conversation, Mr. Reedy would say that's the only comment that Mr. Lister said to him. He's not even sure why he had that call with Mr. Lister at all. I would say because the reason that comment is important for this particular case is direct evidence. Would this be a situation of direct evidence or indirect through McDonald? Now, as I stated earlier and through Mr. Reedy's own testimony, Mr. Lister had no decision power over him. He did not have the authority to fire him at all. He did not hire him. So based on Richardson v. Walmart, they clearly said that through direct evidence, even if there's a comment that's made, in that particular instance, it was a comment saying that the person was too old and it was an age discrimination claim. And two individuals had made that claim. One was a manager in general. One was his direct manager. And in that particular case, they said if he was not the person who actually made the direct adverse decision of the adverse action, then it's not direct evidence. It should be considered indirect evidence. And I will say in this particular case, it's not direct evidence. Even if that claim was made, which we deny, it would be under the indirect evidence. Okay. Thanks for answering our questions. You'll get your full rebuttal. Thank you, Your Honors. Just real quick, the comment was made by Mr. Lister, and it is my client's testimony that it was Mr. Lister who fired him. So the comment was made by the decision. Mr. Lister's job was in safety? Is that what his position was? Safety director, yes, Your Honor. I'm not sure how the structure was. And he had hiring and firing authority? Did he have hiring authority? Yes. That's according to him, yes. According to your client? No, according to Mr. Lister, he has the final say on all hiring decisions. According to my client. Where do we look for that? Is that his deposition? In his deposition. Just give us a rough page if you've got it. If you don't, we'll figure it out. Yes, I do. Oh, man, I just had it. Okay.  I do not. Oh, final say, I'm sorry. Docket number 13-5, page 415. Okay. And then, Your Honor, just real quick, pretext can be shown by many different ways. One, shifting justification, credibility issues, changing rationale. That's in Lewis v. State Department of Corrections. Another way is that the changing rationales were? Yes, changing rationales. Initially, they had stated, if you look at lower docket number 13-7, page 494, Charlotte Jones, when we asked them in an interrogatory, give us the reason why you terminated plaintiff, the reason was he abandoned his truck and that he may have had disciplinary issues. We suspect that's just to give them a little wiggle room in case the first reason did not hold up. The second way to show pretext is it did not actually motivate the claim. We are arguing that leaving the truck was not the sole reason. It was more of an inconvenience, and that should be an issue left for the jury. The district court stated that job abandonment, there was no basis in fact for that. In the district court's opinion, there was no basic basis in fact to believe the job abandonment, but it could be believed that refusal to pick up the truck could be a legitimate reason. In other words, he's saying that may be a basis in fact. One of the things I've never quite understood about this motivation test, and I blame us, not you all, I just don't know what it really means. This is not this case what I'm about to say, but it illustrates my problem with it. You can imagine a trucking company having a policy that says you get a DUI, you're fired, no questions asked, no explanations, it doesn't matter, that's it. But then you look at the record, and it turns out the employer and the driver had had some other problems and disagreements, and we'll say there were some discriminatory comments by the employer predating the couple weeks before the DUI. Do you go to a jury? Because you have this evidence that the decision maker didn't care for this driver based on, let's say, marital status, religion, race, sex, whatever it happens to be. It's pretty good evidence, but we won't call it direct evidence, so it's still an indirect case. Do you go to a jury? Because there's a legitimate debate. Maybe they're just using the DUI as they were just waiting for a way to get rid of him. What happens in that case? That's... Jury question? That's different circumstances. No, no, it's a hypothetical, so I'm there on that. But what happens? That there were racial comments. As you pointed out, motivation is one of the ways to show pretext. So do you have the jury figuring out, were they just looking for a reason to fire this guy, and once the DUI happened, it allowed him to act on their animus? Or do you say it doesn't matter, they had a policy that said no DUIs? Oh, your Honor, I'm sorry. Again, that's a different situation. McDonnell Douglas has been fashioned in order to find the discrete acts of discrimination. So maybe if they were waiting for a reason, then yes, that should go to a jury. Would go to a jury to have a debate about their motivation. Absolutely. Can you enlighten me on this Monday-Tuesday thing? Yes. Sunday, light most favorable to the plaintiff. His testimony on lower court docket number 13-2, page 364-365, he says Sunday he got a call and said he was placed on medical leave. Wait, he gets a call from? Mike. Who's Mike? The other guy who was coming to pick up his truck. Okay, but he's not... But Mike was calling to get the truck, right? Yes. And then he comments, hey, you're on medical leave. I believe Mr. Reedy said, why are you coming to take my truck? And he said, because Mr. Lister said that you're on medical leave. On Monday, same pages, my client testifies that he called Mr. Lister and said, hey, what's going on? Why did you take my truck? Am I on medical leave? And he said, you're fired. Wait, I'm sorry. He calls Lister on Monday? On Monday. When on Monday? I believe at the start of his shift. I'm not positive about the time either on that, Your Honor. Like 2 in the morning? I believe, yes. Okay, and tell me what the discussion is according to your client? He said, why did you have Mike take my truck? He said, I'm on medical leave. And Mr. Lister said, you're fired. The testimony, I don't want to represent something that's not accurate. The testimony is on those pages, but that's the gist of the situation. Okay. And then, Your Honor. And then you're saying he asked if he was on medical leave? Yeah, I believe so. And then he said, you're fired. He was told by Mike that he was on medical leave, and I believe he followed up the next day at the start of his shift with Mr. Lister saying, what's going on? It might have not been at the start of his shift. I'm not positive. But Mr. Lister told him that you're fired. Regardless, he was, at that point, he didn't believe he had an obligation at work because he was told he was on medical leave and he no longer had a truck. Well, didn't he expect that someone was going, I mean, if he's told to pick up the truck, he says, I can't. I have my kids here and everything. Why would it be strange if someone else picked up the truck? That's not strange. What's strange is being told you're on medical leave. I mean, his condition, he was seeking this permission on Thursday, and he's getting this on Sunday by the same guy that said the single parent thing, the same guy who was reported, the worker's compensation claim. Did the company ever admit that he was on medical leave? I do not believe so, Your Honor. And is Mike somebody who has authority to say that he's on medical leave? I believe he's just another driver. However, in my client's testimony, all inferences taken in favor of my client at this stage. Well, no. I mean, you'd need, did Mike, was Mike deposed? No. Okay. And, Your Honor, just to quickly conclude, there are two more cases that are helpful for this perceived disability. First is Fogelman v. Mercy Hospital, Inc., 283 F- I'm sorry, I can't, what versus Mercy Hospital? Fogelman, F-O-G-L-E-man. That's 283. Are these in your brief? Yes. Okay, well, just give us the names so we can look for them. Okay, and then Calibet v. K-A-L-L-A-B-A-T v. Michigan Bell Telephone Company. And those are perception cases about marital status or perception cases about other forms of discrimination? Federal civil rights statutes and, you know, state. Are they disability ones? There is an ADA, an ADEA, and a Pennsylvania civil rights statute, and then also Title VII. All right, thank you for your argument. Thank you both for your helpful briefs and oral arguments and for answering our questions. We really appreciate it. We'll work our way through the case. It will be submitted, and the clerk may call the last case of the day.